**IN THE UNITED STATES DISTRICT COURT
FOR THE DISTRICT OF DELAWARE**

| | | |
|---|---|---|
| CHRISTOPHER J. GERAS, | : | |
| Plaintiff, | : | |
| | : | Civil Action No. _____ |
| v. | : | |
| BANK OF AMERICA, N.A., | : | **COMPLAINT and DEMAND** |
| | : | **FOR JURY TRIAL** |
| Defendant. | : | |

## I.  INTRODUCTION

1. Christopher J. Geras ( "Geras") hereby complains against Defendant Bank of America, N.A. ("BANA") and demands a trial by jury based on allegations that BANA wrongfully reported him to be severely delinquent on a credit card account for which he was never a legal holder and that, while BANA eventually acknowledged its error, it nevertheless declined to take the required steps to remove the credit-card-account tradeline from Geras's consumer file until substantial damage to Geras had already been inflicted.

2. Geras is thus claiming injuries resulting from BANA's negligent and willful failures to comply with its obligations under the Fair Credit Reporting Act, 15 U.S.C. § 1681, *et seq.* ("FCRA").

## II.  THE PARTIES

3. Geras is a citizen of the United States of America currently residing in Marigot, St. Martin, France.

4. Geras was at all relevant times a "consumer" as that term is defined by 15 U.S.C. § 1681a(c).

5. BANA is a national banking association with its principal place of business at 100 North Tryon Street, Charlotte, NC 28255.   According to its website, BANA does business "in every region of the world."

6. BANA is formally incorporated in the State of Delaware.

7. BANA was at all relevant times a "person" as that term is defined by 15 U.S.C. § 1681a(b).

## III.  JURISDICTION AND VENUE

8. This Court has subject matter jurisdiction over Geras's claims, pursuant to 28 U.S.C. § 1331, because the claims have been brought under a federal statute:  FCRA.

9. Venue is proper in this District pursuant to 15 U.S.C. § 1681p and 28 U.S.C. §§ 1391(b)(1) and 1391(c)(2) because BANA resides in this District as it is subject to this Court's personal jurisdiction with respect to this civil action.

10. Upon information and belief, BANA has numerous employees and branch locations in Delaware, and a corporate-headquarters outpost in the City of Wilmington, specifically.

## IV.   FACTUAL BACKGROUND

### A.   The Account

11. On or about July 15, 2002, Geras's father, Robert D. Castillo ("Mr. Castillo"), opened a credit card account (the "Account") with BANA at one of its branch locations in the State of California.

12. Upon information and belief, the credit card agreement for the Account was governed by the laws of Delaware, without regard to its conflict of laws principles, and by applicable federal law.

13. Upon information and belief, the credit card agreement contained a provision indicating that credit was being extended to Mr. Castillo from Delaware.

14. The Account was opened with Mr. Castillo as the sole account holder.

15. Geras never signed an application for the Account or otherwise approved such Account, and never made any charges to the Account.

16. Upon information and belief, BANA no longer has a copy of the application connected to the Account.

17. Upon information and belief, Mr. Castillo at some point added Geras as an "authorized user" of the Account.

18. Upon information and belief, Mr. Castillo made his last payment towards the Account on or about April 9, 2011.

19. At that time, Mr. Castillo owed over $30,000 on the Account.

20. Mr. Castillo eventually filed for and completed a Chapter 7 bankruptcy, and his liability for the Account was discharged.

**B.     Geras's Voyage to the United States**

21. In June 2011, Geras boarded his boat and began a two-month voyage from St. Martin to Maryland, both to obtain his boat-captain's license (a new job requirement) and to repair the boat for later sale.

22. At a stop along the way, Geras attempted to use his Citibank credit card—his only credit card at the time—but it was declined.

23. As Geras's Citibank card had been frozen in the past due to international activity until he verified the charges, he assumed the card had been declined for that reason.

24. Geras continued on his voyage and planned to contact Citibank when he arrived in the United States.

25. Due to a boat-rigging failure, Geras was forced to stop in Beaufort, North Carolina.

26. Upon Geras's arrival in North Carolina in late August 2011, Hurricane Irene threatened the coast and waylaid Geras for several weeks.

27. Since Geras was without the use of his Citibank credit card and had exhausted his cash on hand, during that stretch in North Carolina he lost the ability to independently shelter and feed himself, and he ended up applying for public welfare benefits. Geras also abandoned plans to repair his boat.

**C.   Notification of BANA's Negative Credit Reporting**

28. After the worst of Hurricane Irene had passed, Geras contacted Citibank to verify what he assumed were the international charges.

29. To Geras's surprise, however, Citibank informed him that it had cancelled his card because he had "bad credit".

30. Geras was perplexed because his credit history had been perfect, and his relationship with Citibank in particular dated back twelve years without incident.

31. Geras contacted one of the national credit reporting agencies to order his credit report, which he received on or about December 5, 2011. The report showed derogatory notations for a Bank of America credit card tradeline.

32. The credit report only amplified Geras's earlier confusion regarding his conversation with Citibank, as Geras did not have a Bank of America credit card and because, in any event, he had never received any sort of notification from BANA that it had it both placed derogatory information in his consumer file and then relayed that information to third parties.

33. After inspecting his credit report, Geras—having recently arrived at his destination in Maryland—ran to a local Bank of America branch and, with an employee's assistance, called a BANA representative to discuss the Account.

34. During the phone call, BANA communicated to Geras that the Account had been opened by him, in his name only and with his signature, that the Account was his sole responsibility, and that he was to advise BANA how he expected to pay the more than $30,000 outstanding on the Account.

35. Geras denied that he opened the Account, and asked BANA to send him a copy of whatever document purported to bear his signature. BANA agreed to do so, but never did.

36. Thereafter, Geras filed an online fraud report with the national credit reporting agencies, disputing the negative tradeline for the Account.

37. BANA had caused Geras to think that somehow Mr. Castillo was to blame for the negative reporting. This put tremendous strain on an otherwise strong father-son relationship.

**D.    The Credit Report**

38. Geras received a credit report from Experian that had been prepared on December 26, 2011.

39. The Experian report indicated that Geras was individually responsible for a Bank of America credit card that had been opened in July 2002, and,

paradoxically, that Geras and Mr. Castillo were jointly responsible for a Bank of America credit card that had likewise been opened in July 2002. Regarding the latter, the "status" was noted as: "[c]redit card lost or stolen, closed/Never late."

40. Upon information and belief, BANA, realizing it could not collect from Mr. Castillo the discharged debt on the Account, had surreptitiously switched Geras from authorized-user status to account-holder status in order to try to collect from him relative to the Account.

**E.   Geras's Attempts to Clear the Negative Reporting**

41. On or about January 4, 2012, BANA received Geras's online dispute from the national credit reporting agencies.

42. According to BANA, its review of the dispute was completed on January 13, 2012.

43. By its own admission, BANA was unable to verify the accuracy of the disputed information in Geras's consumer file relative to the Account.

44. BANA communicated to Geras that it would correct the negative reporting. Yet, months went by, and no correction was made.

45. Geras called BANA multiple times to check the status of the report, and during these calls he was either provided false information, transferred from department to department, delayed, or dropped from the call altogether.

46. On or about May 2012, Geras contacted Citibank in an attempt to get his credit card reinstated as, he presumed, a sufficient amount of time had passed for the negative report to be cleared.

47. But Citibank informed Geras that BANA had maintained the negative reporting and that, as such, Citibank would not reinstate his credit card account.

48. Apparently, instead of deleting the tradeline for the Account, BANA was instead experimenting with different language for the Account status, all of which was derogatory and harmful to Geras's credit profile.

49. On or about May 21, 2012, Geras contacted BANA by phone due to Citibank's refusal to reinstate his account.

50. At that time, BANA's excuse for failing to correct the information on the tradeline for the Account was that such correction takes time.

51. As the negative information was still being disseminated by credit reporting agencies, in June 2012, Geras again contacted BANA by phone.

52. Geras also filed an Executive Complaint with the Consumer Financial Protection Bureau.

53. On or about July 19, 2012, BANA received the Executive Complaint.

54. On or about July 27, 2012, BANA allegedly "re-submitted" a "deletion request" to the national credit reporting agencies.

55. On or about August 2, 2012, BANA mailed a letter to Geras

confirming that the Account was reporting negatively on his consumer file.

56. After nine months of multiple requests and countless hours of time and energy attempting to have BANA correct its error, Geras retained a lawyer – Russell D. Barr, Esq.

57. On September 13, 2012, attorney Barr mailed a letter to BANA regarding its inaccurate credit reporting.

58. On October 1, 2012, BANA mailed a responsive letter to attorney Barr.

59. Shortly after BANA mailed its October 1, 2012 letter, and nearly a year after it had received notice of the inaccurate reporting, the negative Bank of America tradeline was finally removed from Geras's consumer file.

60. In February 2013, Geras, through attorney Barr, filed suit against BANA in the United States District Court for the District of Vermont ("the Vermont action").

61. A summons issued but attorney Barr never served BANA with the complaint in the Vermont action, which has since been voluntarily dismissed.

**F.     Certain Effects of the Negative Credit Report**

62. In addition to Citibank's refusal to re-extend him credit, Geras applied for credit from several other banks and was denied by all except one, which provided him with a very small line (less than $1000) of credit.

63. Because of BANA's actions, Geras's twelve-year history of formerly flawless credit was severely compromised, including a substantial reduction in his FICO score.

64. BANA's failure to promptly and properly provide the national consumer reporting agencies with the corrected information caused Geras to spend an exorbitant amount of time and effort making calls to attempt to rectify his situation and, given the context in which said failure occurred, caused him to suffer great emotional distress, anxiety, and frustration.

65. His credit having been ruined by the negative BANA tradeline, Geras was unable to adequately fix up his boat. He ultimately resigned to sell the boat for tens of thousands of dollars less than market value.

66. BANA's conduct as outlined herein jeopardized Geras's financial stability such that he had to delay applying for a boat captain's license—a new requirement for his line of work—which in turn delayed his ability to captain charters in the Caribbean, resulting in a substantial loss of income.

## V. CAUSE OF ACTION

**FCRA – Negligent and Willful Violations of 15 U.S.C. § 1681s-2(b)**

67. Geras repeats and re-alleges each and every allegation set forth above with the same force and effect as if fully set forth herein.

68. After receiving notice of Geras's dispute, BANA failed to conduct a reasonable investigation with respect to the disputed information, in violation of 15 U.S.C. § 1681s-2(b)(1)(A).

69. After determining that the negatively reported Account information was incomplete or inaccurate or otherwise unverifiable, BANA for many months failed to effectively relay that determination to all of the nationwide consumer reporting agencies, in violation of 15 U.S.C. § 1681s-2(b)(1)(D)

70. After determining that the negatively reported Account information was incomplete or inaccurate or otherwise unverifiable, BANA failed to "promptly" modify, delete, or permanently block that item of information, in violation of 15 U.S.C. § 1681s-2(b)(1)(E).

71. BANA acted without ordinary care when it investigated Geras's dispute, and its actions were objectively unreasonable.

72. BANA's violations of FCRA were either intentional or committed with reckless disregard for its obligations thereunder.

73. As a result of BANA's FCRA violations, Geras suffered damages, including but not limited to those damages described above and incorporated here by reference.

**WHEREFORE**, Geras demands judgment against BANA, and seeks the following relief:

[1]     actual damages under 15 U.S.C. §§ 1681n and 1681o;

[2]     punitive damages under 15 U.S.C. § 1681n;

[3]     the costs of the action together with reasonable attorney's fees pursuant to 15 U.S.C. §§ 1681n and 1681o; and

[4]     other relief as the Court may find necessary and appropriate.


Dated:      January 10, 2014                    Respectfully submitted,


/S/ Vivian A. Houghton
Vivian A. Houghton, Esq.
DE Bar ID No. 2010
THE LAW OFFICE OF
VIVIAN HOUGHTON, INC.
800 West Street
Wilmington, DE 19801
Tel:  (302) 658-0518
Fax:  (302) 658-5731
vivianhoughton@comcast.net

Joseph Alan Venti, Esq.
PA Bar ID No. 209799
WILLIAMS CUKER BEREZOFSKY
1515 Market Street, Ste 1300
Philadelphia, PA 19102
Tel:  (215) 557-0099
Fax:  (215) 557-0673
joeventi@wcblegal.com

*Counsel for Plaintiff, Christopher J. Geras*